Filed 4/17/14  In re D.G. CA2/6

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

| | |
|---|---|
| In re D.G., a Person Coming Under the Juvenile Court Law. | 2d Juv. No. B252131 (Super. Ct. No. J068692) (Ventura County) |
| VENTURA COUNTY HUMAN SERVICES AGENCY,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>B.B.,<br><br>    Defendant and Appellant. | |

B.B. (father) appeals the juvenile court's jurisdiction and disposition orders sustaining a dependency petition as to father's minor child D.G., and declaring the minor to be a ward of the court.  (Welf. & Inst. Code,[1] § 300.)  Father contends the court's jurisdictional findings are not supported by substantial evidence.  We affirm.

FACTS AND PROCEDURAL HISTORY

D.G. was born in December 2008.  On February 22, 2012, the Ventura County Human Services Agency (HSA) filed a dependency 300 petition as to D.G. alleging failure to protect and no provision for support.  (§ 300, subds. (b) & (g).)  The

_____

[1] All further section references are to the Welfare and Institutions Code.

petition alleged that D.G.'s parents had been arrested for domestic violence and child endangerment and had a history of engaging in domestic violence with D.G. present. Father also abused alcohol, while mother was known to abuse methamphetamine and heroin.[2] The petition further alleged that mother "has unresolved mental health issues which interfere with her ability to provide adequate care and support to the child as evidenced by her having a diagnosis of Manic Depressive Disorder and not complying with her medication regimen. Such condition periodically renders her unable to provide adequate care and support for the minor." It was also noted that mother had been offered family maintenance services after D.G.'s birth, yet had "not subsequently made reasonable efforts to treat the problems which led to the voluntary services previously offered."

D.G. was placed with the paternal grandmother and mother and father were offered six months of reunification services with visitation. Mother and father were also ordered to comply with a case plan that included random drug testing and participation in a domestic violence program, parenting education, and substance abuse services. Six months of additional services were subsequently offered. At an interim review hearing in November 2012, the court found that mother and father had made substantial progress on the case plan. The court also found, however, that they had yet to demonstrate their ability to parent D.G. over an extended period of time and had not completed their domestic violence program. The court accordingly ordered HSA to provide family maintenance services and set the matter for review on February 19, 2013, the date previously set for the 12-month review hearing. At the February 2013 hearing, the court found continued supervision of D.G. was unnecessary and terminated the dependency case.

On August 9, 2013, HSA filed the dependency petition that is the subject of this appeal. The petition alleged that on July 5, 2013, mother—while in a manic phase of her bipolar disorder and with father's knowledge—took D.G. to San Francisco on a bus.

---

[2] Mother is not a party to this appeal.

2

Mother left suddenly without packing any clothes because she believed that wild animals were coming into the house. Mother did not feed D.G. while they were travelling to San Francisco, and D.G. spent at least one night sleeping on the sidewalk without shoes or a jacket.

On July 8, mother called the paternal grandmother and told her she needed help returning to her home in Ventura because she had run out of money and lost her credit cards. The paternal grandmother picked them up and took them to her home in Kern County. The paternal grandmother recounted that "mother was acting very 'paranoid/crazy'" and believed that the paternal grandmother's bathroom was "contaminated."

During a visit at mother's home on July 18, 2013, mother admitted to the social worker that she had not taken her prescribed medications for about two months and was drinking alcohol. Mother also reported that D.G. had remained with the paternal grandmother after she picked them up in San Francisco. When asked about visible bruises on her neck, mother claimed they were merely "hickies" and denied the bruises were the result of domestic violence.

Three days after the social worker's visit, mother attempted to commit suicide and was placed on a psychiatric hold. Mother made the attempt by inflicting injuries to her arms and legs that required 150 to 200 stitches. Father stated he was not home during the incident.

On July 28, 2013, mother was released from the hospital. Two days later, father informed HSA that he planned to pick D.G. up from the paternal grandmother's home his next day off work. Father refused to meet with the social worker or make a case plan to insure D.G.'s safety, claiming he had "better things to do." When the social worker spoke to father on the telephone and expressed her concerns about D.G. returning home, father replied that D.G. was fine and said, "[she] is not your fucking kid." Father then abruptly ended the call by hanging up.

On July 31, 2013, the social worker called father after he left a message agreeing to meet with her. Father refused, however, to meet at the HSA office. When

3

the social worker informed father that she would be accompanied by law enforcement if she met him at his house, he said he would throw her off his property. That same date, the paternal grandmother notified the social worker that father had directed the great grandmother to say that her only concerns were with regard to mother's care of D.G., and not father's.

The social worker met with father at his home on August 1, 2013. Father told the social worker that mother had stopped taking her medications because "she is fucking crazy" and that is "what crazy people do." Father also said he had instructed mother not to sign any paperwork provided by HSA.

On August 2, 2013, the social worker called mother and the paternal grandmother. They agreed to attend a family meeting on Monday, August 5th. They also agreed to a safety plan providing that neither parent would take D.G. out of the paternal grandmother's house prior to the family meeting unless another family member was present. When the social worker called father to advise him of the family meeting and interim safety plan, father said he was "sick of the investigation, felt the [social worker] had no right to impose rules, and stated that there is no right for the [social worker] to be investigating the referral." Father then terminated the call by hanging up. Later that day, he called the social worker back and offered he had terminated the prior call in order to avoid yelling at the social worker. Father verified that he would attend the August 5th family meeting.

The family meeting was held at the paternal grandmother's house. When the social worker asked mother about her suicide attempt, father interjected and said mother did not need to discuss her mental health. Father allowed mother to sign a release of confidentiality form, but crossed out certain terms and wrote that the release was limited to verifying therapeutic services. During the meeting, the social worker "observed what appeared to be a healing stab wound to her inner thigh." Mother also "had a significant healing cut injury to her left upper arm."

After father left the family meeting, the social worker wrote a safety plan requiring mother to notify the paternal grandmother or a neighbor if she went off her

4

psychotropic medication or felt like she wanted to hurt herself or others. The plan also provided that mother could not be D.G.'s sole caretaker until her attendance in therapy was verified. Mother refused to sign the plan until father returned to the meeting. When father returned, he refused to allow mother or the paternal grandmother to sign the plan and declined to sign it himself as well.

On August 7, 2013, D.G. was detained with the paternal grandmother in Kern County. When the social worker advised mother of the detention and related hearing date, mother said she was willing to work with HSA but had been unable to do so because father dictated her behaviors. Mother said she was planning to terminate her relationship with father and had been planning to enroll in family services in Kern County without father's knowledge.

On August 26, 2013, mother arrived for a visit with D.G. with a black eye and injuries to her legs. She claimed that a neighbor had inflicted the injuries, then left before the visit began. Four days later, mother informed the social worker that she and father were still a couple and were living together in Ventura. She also said she had stopped taking her medications and had been diagnosed with borderline personality disorder and depression.

When the social worker met with father and his attorney that same day, father offered that mother sometimes forgot to take her medications. Father also said that when mother "slips off her meds" she usually replaces the medication with alcohol. Father believed, however, that mother's mental illness "does not impede her parenting skills." Father admitted prior alcohol and drug abuse. He also admitted that he still drank alcohol once or twice a week, but it was always less than a six-pack. With regard to the safety plan, he claimed that mother had decided not to sign it. Although he verbally agreed to the plan, he would not sign it because "he had been lied to already." He said he would have mother move out if D.G. were returned to him and could change his work schedule to accommodate caring for the child. He was not willing, however, to participate in any court-ordered services because he did not believe they would help. He

5

also refused to submit to random drug testing and rejected the social worker's referrals to other services.

In a September 2013 update report, HSA stated that father had not visited D.G. because he refused to participate in supervised visits at the HSA office. Mother was attending weekly supervised visits. Father was given permission to attend a party the paternal grandmother planned for D.G., but he failed to show up.

Following the October 9, 2013, contested hearing, the juvenile court sustained the allegations of the section 300 petition, declared D.G. a dependent, and ordered that mother and father be provided family reunification services.

DISCUSSION

Father does not dispute that the evidence is sufficient to sustain the juvenile court's jurisdictional and dispositional findings as to mother. He claims, however, that the orders must be reversed because the jurisdictional findings involving *his* conduct are not supported by substantial evidence. We are not persuaded.

"'When a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, a reviewing court can affirm the [trial] court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence. In such a case, the reviewing court need not consider whether any or all of the other alleged statutory grounds for jurisdiction are supported by the evidence.' [Citation.] However, we generally will exercise our discretion and reach the merits of a challenge to any jurisdictional finding when the finding (1) serves as the basis for dispositional orders that are also challenged on appeal [citation]; (2) could be prejudicial to the appellant or could potentially impact the current or future dependency proceedings [citations]; or (3) 'could have other consequences for [the appellant], beyond jurisdiction' [citation]." (*In re Drake M.* (2012) 211 Cal.App.4th 754, 762-763.)

Father does not challenge the jurisdictional findings involving mother's conduct, so any ruling on the allegations involving father's conduct will not lead to a reversal of the court's jurisdictional order. (*In re I.A.* (2011) 201 Cal.App.4th 1484,

6

1492.)  Because father sought to have D.G. placed with him as non-offending parent, however, we shall consider whether any of the allegations as to him are supported by sufficient evidence.  (*In re Drake M., supra*, 211 Cal.App.4th at p. 763.)

In sustaining the allegations of the petition as to father, the juvenile court found that father:  (1) has a history of alcohol abuse that interferes with his ability to provide care and support for D.G.; (2) was aware of mother's ongoing mental instability and yet failed to intervene to protect D.G.; (3) failed to cooperate with HSA by refusing to participate or allow mother to participate in a safety plan; and (4) failed to benefit from previously-offered services.  The court further found that these actions or lack of actions "place[d] the minor . . . at significant risk of future physical and emotional harm."

Father claims that these findings are not supported by sufficient evidence.  In reviewing his claim, "[w]e review the record to determine whether there is any substantial evidence to support the juvenile court's conclusions, and we resolve all conflicts and make all reasonable inferences from the evidence to uphold the court's orders, if possible.  [Citation.]  'However, substantial evidence is not synonymous with *any* evidence.  [Citations.]  A decision supported by a mere scintilla of evidence need not be affirmed on appeal.  [Citation.]  Furthermore, "[w]hile substantial evidence may consist of inferences, such inferences must be 'a product of logic and reason' and 'must rest on the evidence' [citation]; *inferences that are the result of mere speculation or conjecture cannot support a finding* [citations]."  [Citation.]  "The ultimate test is whether it is reasonable for a trier of fact to make the ruling in question in light of the whole record."  [Citation.]'  [Citation.]"  (*In re David M.* (2005) 134 Cal.App.4th 822, 828; *In re Drake M., supra*, 211 Cal.App.4th at p. 763.)

Substantial evidence supports the sustained allegations involving father.  Father's arguments to the contrary essentially ignore the controlling standard of review, which compels us to resolve evidentiary conflicts and draw all reasonable inferences therefrom in favor of the judgment.  (*In re David M., supra*, 134 Cal.App.4th at p. 828.)  Father also misplaces his reliance on the absence of evidence indicating that D.G. has suffered actual physical harm as a result of father's actions or inactions.  The evidence

7

need only show that father's failure or inability to care for D.G. created a substantial risk of future harm (*In re J.N.* (2010) 181 Cal.App.4th 1010, 1023), and the evidence is sufficient to support that finding here. Among other things, father refused to sign a safety plan for D.G. and also induced mother and the paternal grandmother to refrain from signing it. He also refused to participate in any services that were not court-ordered and obstructed the social worker's attempts to talk to mother about her mental health. He further admitted knowing that mother often went off her medication while D.G. was in her care, and minimized the gravity of the incident when mother took the child to San Francisco. In light of this evidence, the juvenile court reasonably found that father had failed to protect D.G. from the risk of physical harm. The cases father cites in which similar findings were reversed for insufficient evidence are plainly inapposite. (See *In re X.S.* (2010) 190 Cal.App.4th 1154, 1160 [evidence was insufficient to support finding that the minor faced a substantial risk of physical harm as a result of his father's failure to provide for the child before the father's paternity was established]; *In re J.O.* (2009) 178 Cal.App.4th 139, 152 [no "causal nexus" between father's failure to provide minor with necessities of life and allegations that the minor suffered physical harm as a result of his mother's infliction of physical abuse and excessive discipline]; *In re James R.* (2009) 176 Cal.App.4th 129, 134-136 [absent any evidence of prior abuse or neglect, evidence was insufficient to support finding that mother's "history of mental instability" placed minors at a substantial risk of physical harm].)

The record belies father's claim that he sought to protect D.G. by taking her to the paternal grandmother's home after the San Francisco trip. It is also irrelevant whether he "disputes [that] a signed safety plan was necessary." HSA determined that such a plan *was* necessary, and the juvenile court was entitled to make such a finding. The fact that father was unable to appreciate the need for a safety plan, and his refusal to agree to such a plan, is sufficient by itself to support the finding that he was either unable or unwilling to protect D.G. against the risk of physical harm. Moreover, the undisputed evidence relating to mother's actions supports the finding that D.G. faced a substantial risk of physical harm if she were left in mother's care. Because this evidence is sufficient

8

to sustain the allegation that father had failed to protect D.G. as contemplated under subdivision (b) of section 300, we need not decide whether the other allegations as to father are supported by substantial evidence. (*In re Drake M., supra*, 211 Cal.App.4th at p. 762.)

The jurisdiction and disposition orders are affirmed.

NOT TO BE PUBLISHED.

PERREN, J.

We concur:

GILBERT, P. J.

YEGAN, J.

9

Bruce A. Young, Judge

Superior Court County of Ventura

_____


Kimberly A. Knill, under appointment by the Court of Appeal, for Defendant and Appellant.

Leroy Smith, County Counsel, Linda Stevenson, Assistant County Counsel, for Plaintiff and Respondent.