Filed 1/5/26  In re Baby Boy C. CA2/4

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re Baby Boy C., a Person Coming Under the Juvenile Court Law. | B340822<br><br>(Los Angeles County Super. Ct. Nos 22CCJP02079, 22CCJP02079H) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and  Respondent.<br><br>    v.<br><br>L. C.,<br><br><br>    Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Tiana J. Murillo, Judge.  Affirmed.

Liana Serobian, under appointment by the Court of Appeal, for Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, Jessica S. Mitchell, Deputy County Counsel, for Plaintiff and Respondent.

Mother L.C. appeals from the juvenile court's jurisdiction and disposition orders finding jurisdiction over her infant son, T., pursuant to Welfare and Institutions Code section 300, subdivision (j).[1] She challenges the juvenile court's assertion of jurisdiction, arguing that the court lacked substantial evidence to find a current risk of harm to T. based only on sustained allegations of domestic violence in an ongoing dependency case involving her older children. She also contends the court should have dismissed the case at disposition with an order allowing her to participate in voluntary services. We find no error in the trial court's orders and therefore affirm.

## BACKGROUND

### I. Petition

Mother and father K.W. are parents to T. (born December 2023) and K. (born 2021). Mother also has three older children, J.B. (born 2004), Ja. (born 2006) and Jo. (born 2011).[2] The family most recently came to the attention of the Los Angeles County Department of Children and Family Services (DCFS) from a referral in February 2024 alleging that mother and father had been arrested due to domestic violence between them.

At the time of the February 2024 referral, there was an open case regarding T.'s older siblings, Ja., Jo., and K., based on sustained allegations of domestic violence between mother and father. On October 5, 2023, law enforcement responded to a report that mother and father were arguing in the street. Father was intoxicated and pushed mother while she was holding K. Mother was pregnant with T. at the time. Father was arrested; mother declined an emergency protective order. In a second incident on October 20, law enforcement responded after mother reportedly slapped father during an argument. Mother denied any physical altercation. Father provided video footage to law enforcement showing mother slapping his face. Mother was arrested. On October 22, mother reported to the police that she had been tracking father's cell phone and knew he was inside his home with K., but he

---

[1]     All undesignated statutory references are to the Welfare and Institutions Code.

[2]     T. is the only child at issue in this appeal. Father is not a party to the appeal, nor is D.B. (father of J.B. and Ja.) or C.M. (father of Jo.).

would not give her the child. Mother was arrested for violating the protective order. The children (Ja., Jo., and K.) were detained and placed with maternal grandmother (MGM).

In February 2024, DCFS received the instant referral that mother had given birth to T. sometime in December 2023. The referral noted the October 2023 incidents and reported that mother was "noncompliant and uncooperative." DCFS noted that mother might have behavioral health concerns, but mother had not been cooperative with prior recommendations for a psychiatric evaluation and had "outbursts" toward DCFS staff members. The referral stated that after mother gave birth, she "went into hiding" and that further information on the whereabouts or health of mother or T. was unknown. Mother's older children remained placed with MGM and mother was not compliant with her case plan as to those children.

Mother spoke with a DCFS children's social worker (CSW) by phone on February 27, 2024. She stated that she did not understand why DCFS was asking about T. because she was a domestic violence victim. The CSW explained that because mother had an open family reunification case, DCFS needed to assess the newborn baby. Mother stated that she had a restraining order against father and had no contact with him, and that she was in compliance with her case plan, but did not trust DCFS. Mother wanted to speak with an attorney before meeting with the CSW.

On March 11, 2024, CSW Valencia, assigned to the older children's case, met with MGM at her home. During this meeting, mother and infant T. arrived to visit the other children. Mother provided the CSW with T.'s first name, but not his last name, date of birth, the identity of his father, or her current address. CSW Valencia reported that T. appeared comfortable in mother's arms and she observed no marks or bruises when mother changed the baby's diaper. Mother claimed she had spoken to an attorney who said she did not need to meet with the CSW on T.'s case. A few days later, on a phone call with CSW Estis, assigned to T.'s case, mother said she had not spoken to an attorney. Mother provided documentation that she had enrolled in parenting and domestic violence classes. She also obtained a three-year protective order against father in November 2023.

3

After several attempts to locate mother's residence, CSW Estis spoke with mother by phone on June 6. The CSW asked to meet with mother and assess the baby, but mother stated that since CSW Valencia saw T. in March, no meeting was needed. Mother refused to provide information about the child.

In July 2024, DCFS filed a dependency petition regarding T. under section 300, subdivisions (a), (b)(1), and (j). Allegations a-1, b-1, and j-1 alleged that mother and father had a history of engaging in violent physical altercations, including the incidents in October 2023. The petition also alleged that T.'s siblings were dependents of the court due to mother and father's violent conduct.

In the detention report, DCFS detailed mother's lengthy prior history with the department. This included substantiated allegations in 2005 of domestic violence between mother and a boyfriend, substantiated allegations in 2013 of general neglect when mother left three of her children alone in the care of eight-year-old J.B., and substantiated allegations in 2022 that mother was arrested after brandishing scissors at Ja. DCFS also noted multiple inconclusive allegations of domestic violence from 2015 to 2023, often involving calls to law enforcement and uncooperative conduct by mother.

In a July 2024 last-minute information, mother reported that she had attempted to contact CSW Valencia multiple times but had been unable to reach her. She had started a treatment center domestic violence program in April 2024. Mother's case manager reported that mother regularly attended her classes and had shown a willingness to change.

Mother agreed to bring T. to the center and allowed CSW Estis to assess the child on July 2, 2024. Mother stated that she had been fearful of meeting with the CSW because she had trust issues with DCFS from prior experiences. Mother apologized for not making herself available sooner. She agreed to comply with her case plan and denied contact with father.

At the July 5, 2024 detention hearing, the court found a prima facie case for jurisdiction but that there were reasonable services available to prevent T.'s detention from mother. The court ordered T. to remain released to mother on the condition that mother continue to participate in her current programs, cooperate with DCFS, and make T. available for visits.

4

## II.   Jurisdiction/Disposition Report

In the August 2024 jurisdiction/disposition report, DCFS reported that the dependency case for Ja., Jo., and K. remained pending.  In that case, the court sustained the petition based on the allegations of the domestic violence incidents in October 2023.  There, mother was ordered to complete domestic violence classes, anger management, parenting, and individual counseling.

On July 22, 2024, a DCFS investigator spoke to mother to schedule an interview.  Mother stated she would record the interview and that she wanted her attorney present.  As of the time of the report in August, mother's counsel had not responded to DCFS's requests to be interviewed.

DCFS located father and spoke with him in July. Father stated he was not living in California and had no contact with mother.

## III.   Adjudication and disposition

A CSW met with mother and T. on August 16.  Mother stated she would allow the CSW to examine T. during the visit but would not allow examination at future visits.  Mother stated that in the future, the CSW could "quickly see the home and child and then immediately leave." The CSW told mother they needed to examine the child and go over mother's case plan progress at each visit; mother laughed.  Mother "continued to decline" to sign consent forms to release information from her service providers.  Mother also stated she had phone contact with father so that he could have virtual contact with the baby.  The CSW noted mother's restraining order and mother said she would check with her attorney.

The CSW told mother that some of her training programs were online courses and were not approved by DCFS.  Although mother had started an in-person program, it was not clear if she was getting individual counseling.  DCFS stated that mother had "improved" communication with DCFS but remained in partial compliance.  DCFS noted mother's behaviors were defensive and evasive with DCFS and she lacked insight into the issues that brought her family to the court.

The court held the adjudication hearing on August 27, 2024.  Father was not present and had not appeared in the case.  Mother testified that she was no longer in a relationship with father and had not had contact with him since October 2023.  After the domestic violence incident that month, she got

5

a three-year restraining order against father. She described their relationship as "bittersweet" and testified that she now understood it was emotionally abusive.

Mother testified about what she had learned in her domestic violence program and her parenting class. She explained that she was in the process of divorcing father. She recalled police visiting father's home three times while they were together. She denied violating the emergency protective order on October 22, 2023 by going to father's home and stated that she was never the perpetrator of domestic violence against father. However, she admitted being arrested following that incident for domestic violence and violating a protective order. She had completed the anger management class ordered in the dependency case involving her other children. When questioned about why she was ordered to take anger management class, she testified that she did not know why the court had ordered it because she was never the aggressor.

Mother's counsel argued that there was insufficient evidence for jurisdiction, given mother's participation in programs and the lack of evidence of ongoing contact with father. T.'s counsel asked the court to sustain the petition based on the long history of domestic violence between mother and her partners, including the recent incident in which mother violated the protective order while pregnant with T. Counsel for DCFS agreed, arguing that mother's testimony demonstrated she still lacked insight.

The court found DCFS had not met its burden to establish jurisdiction as to counts a-1 or b-1. However, the court sustained the petition as alleged in count j-1, finding T. to be a person described by section 300, subdivision (j). The court found that mother "was able to testify fairly credibly today about some of the services she's engaged in, some of the insight that she has attained. However, I still have outstanding concerns as to the level of insight for me to find that there is actually no current risk" of harm to T. The court noted that T. was "slightly differently situated" from his siblings, as evidenced by the court allowing him to remain with mother. However, "the child is very young and domestic violence relationships are different, and they are complex . . . in toxic dynamics." The court cited the "long history of

6

toxic entanglement" between mother and father, including the October 2023 incident, as well as mother's testimony regarding her anger management class demonstrating that "there is still insight to be gained." The court found that the evidence that mother and father had not had an altercation in the past few months did not "alone suggest there is no current risk to this child," noting that they were still married and that mother had "insight issues." The court continued the matter for disposition.

DCFS completed an unannounced visit at mother's home on August 28, 2024. Mother initially refused to allow the CSW to enter the home; mother then began to record the interaction. Mother eventually allowed the CSW into the home. The CSW completed a walk-through of the home, but mother would only allow her to walk as far as the doorway of her bedroom. Mother continued to refuse to sign all consent forms and DCFS reported that the Department of Mental Health had terminated linkage attempts after mother refused services.

In a last-minute information on September 11, DCFS reported that mother had enrolled in a new 12-week anger management program and had attended two sessions as of September 5.

At the September 17, 2024 disposition hearing, mother's counsel asked to close the case with a custody order. Mother's counsel stated that mother disagreed with statements by DCFS that she was uncooperative and denied the report by DCFS that she recently had contact with father. Counsel for T. and DCFS asked the court to retain jurisdiction to allow T. to stay with mother and complete her case plan under court supervision.

The court found it would be detrimental to T. not to retain jurisdiction, but that there were services to prevent removal from mother. The court therefore ordered T.'s removal from father but continued placement with mother. The court found DCFS credible as to mother's lack of cooperation and cautioned mother that, while it understood her dislike and distrust, "the best way through this, given that there are sustained allegations, is to . . . comply with the court's orders." Mother's case plan included programs on domestic violence for victims, anger management, and parenting, along with individual counseling. The court also ordered mother to comply with the restraining order.

7

Mother timely appealed from the jurisdiction and disposition orders.

## IV.    Subsequent Proceedings[3]

In April 2025, the court terminated jurisdiction over T., with a custody order granting sole legal and physical custody to mother.  Upon the expiration of the restraining order in 2026, the court provided monitored visitation for father.

## DISCUSSION

Mother argues that the evidence was insufficient to support the juvenile court's jurisdiction findings, because there was no substantial risk of harm to T. at the time of adjudication.  DCFS contends the appeal is moot because the juvenile court subsequently terminated jurisdiction and awarded full custody to mother.  We reach the merits of the appeal and conclude that substantial evidence supports the juvenile court's orders.

## I.    Justiciability

Under the doctrine of justiciability, "[a] court is tasked with the duty "'to decide actual controversies by a judgment which can be carried into effect and not to give opinions upon moot questions or abstract propositions or to declare principles or rules of law which cannot affect the matter in issue in the case before it."'" (*In re D.P.* (2023) 14 Cal.5th 266, 276 (*D.P.*).)  A case becomes moot when a court cannot render effective relief. "[R]elief is effective when it 'can have a practical, tangible impact on the parties' conduct or legal status.'" (*Id.* at p. 277.)  "A reviewing court must "'decide on a case-by-case basis whether subsequent events in a juvenile dependency matter make a case moot and whether [its] decision would affect the outcome in a subsequent proceeding."'" (*Id.* at p. 276, quoting *In re Anna S.* (2010) 180 Cal.App.4th 1489, 1498.)

In the dependency context, an appeal is not moot where the "juvenile court's finding forms the basis for an order that continues to impact a parent's rights—for instance, by restricting visitation or custody." (*D.P., supra*, 14 Cal.5th at p. 276, citing *In re Joshua C.* (1994) 24 Cal.App.4th 1544, 1548.)  Where "reversal of the jurisdictional finding calls into question the validity of orders based on the finding, review of the jurisdictional finding

---

[3]    We grant DCFS's request for judicial notice of subsequent proceedings in this matter.

can grant the parent effective relief," even after the juvenile court has terminated its jurisdiction. (*D.P., supra*, 14 Cal.5th at p. 277.) But when the juvenile court terminates jurisdiction without issuing any order that continues to impact the appealing parent, that parent must show some harm beyond a general complaint of "stigma" to avoid mootness. (*Ibid*.) "The stigma must be paired with some effect on the plaintiff's legal status that is capable of being redressed by a favorable court decision." (*Ibid*.)

Recently, our Supreme Court held that a case is not moot where a parent can demonstrate that a sustained allegation would be reportable to California's Child Abuse Central Index (CACI). (*In re S.R.* (Dec. 1, 2025, S285759) -- P.3d --, 2025 WL 3441901 at *5.)[4] The court reasoned that a parent who has shown that they have been or will be listed in the CACI has met their burden to show an ongoing harm, as inclusion in that database "carries serious legal consequences for [the parent's] lifetime." (*In re S.R., supra*, at *5.)

Mother, whose reply brief was filed prior to the issuance of *In re S.R.*, has not established that the allegations here would require reporting to the CACI. Nor has she shown any other ongoing "tangible legal or practical consequence" resulting from the juvenile court's orders. (*D.P., supra*, 14 Cal.5th at p. 278.) Thus, we agree with DCFS that the appeal is moot.

However, even where a case is moot, we have "'inherent discretion'" to reach the merits of an appeal. (*D.P., supra*, 14 Cal.5th at p. 282.) In deciding whether to exercise discretionary review, "courts may consider whether the challenged jurisdictional finding 'could be prejudicial to the appellant or could potentially impact the current or future dependency proceedings,' or "'could have other consequences for [the appellant], beyond jurisdiction.'"" (*Id*. at p. 285.) "Ultimately, in deciding whether to exercise its discretion, a court should be guided by the overarching goals of the dependency system: 'to provide maximum safety and protection for children' with a 'focus' on 'the preservation of the family as well as the safety, protection, and physical and emotional well-being of the child.'" (*Id*. at p. 286.) Under the circumstances

---

[4]     The CACI is a database comprised of substantiated reports of "child abuse or severe neglect," as defined by statute. (Pen. Code, § 11169, subd. (a); see id., § 11170.)

here, including the ongoing dependency proceedings for mother and her children, we will exercise our discretion to review the merits of mother's appeal.

## II.   Jurisdiction

### A.   Governing Principles

"'In reviewing a challenge to the sufficiency of the evidence supporting the jurisdictional findings and disposition, we determine if substantial evidence, contradicted or uncontradicted, supports them.  "In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court."'" (*In re I.J.* (2013) 56 Cal.4th 766, 773.)  "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court.  '"[T]he [appellate] court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence . . . such that a reasonable trier of fact could find [that the order is appropriate]."'" (*Ibid.*; see also *In re Dakota H.* (2005) 132 Cal.App.4th 212, 228 ["The [order] will be upheld if it is supported by substantial evidence, even though substantial evidence to the contrary also exists and the trial court might have reached a different result had it believed other evidence."].)

At the jurisdictional hearing, the court considers whether the child is described by one or more subdivisions in section 300. Section 300, subdivision (j) provides that any child may come within the jurisdiction of the juvenile court if "[t]he child's sibling has been abused or neglected, as defined in subdivision (a), (b), (d), (e), or (i), and there is a substantial risk that the child will be abused or neglected, as defined in those subdivisions."

The court need not wait until a child is seriously abused or injured to assume jurisdiction and take steps necessary to protect the child.  (*In re N.M.* (2011) 197 Cal.App.4th 159, 165.)  "'The purpose of dependency proceedings is to prevent risk, not ignore it.'" (*Jonathan L. v. Superior Court* (2008) 165 Cal.App.4th 1074, 1104.)  The court may consider past events in deciding whether a child currently needs the court's protection.  (*Ibid.*)  A parent's

"'[p]ast conduct may be probative of current conditions' if there is reason to believe that the conduct will continue." (*In re Kadence P.* (2015) 241 Cal.App.4th 1376, 1383–1384, disapproved on other grounds by *In re N.R.* (2023) 15 Cal.5th 520, 560, fn. 18; see also *In re S.O.* (2002) 103 Cal.App.4th 453, 461.) However, evidence of past conduct, without more, is insufficient to support a jurisdictional finding under section 300. "There must be some reason beyond mere speculation to believe the alleged conduct will recur." (*In re James R.* (2009) 176 Cal.App.4th 129, 135–136, abrogated on other grounds by *In re R.T.* (2017) 3 Cal.5th 622, 628.) "The appellant has the burden of showing there is no evidence of a sufficiently substantial nature to support the findings or orders." (*In re E.E.* (2020) 49 Cal.App.5th 195, 206.)

### B. Analysis

Mother argues that the juvenile court erred by finding a current risk of harm to T. based on mother's past domestic violence issues and the sustained allegations regarding T.'s siblings. We disagree.

Section 300, subdivision (j) requires the juvenile court to consider "'the circumstances surrounding the abuse or neglect of the sibling, the age and gender of each child, the nature of the abuse or neglect of the sibling, the mental condition of the parent or guardian, and any other factors the court considers probative in determining whether there is a substantial risk to the child.' This 'expansive statutory language' has been interpreted to require the juvenile court "'to consider the totality of the circumstances of the child and his or her sibling in determining whether the child is at substantial risk of harm, within the meaning of any of the subdivisions enumerated in [section 300,] subdivision (j).""" (*In re D.B.* (2018) 26 Cal.App.5th 320, 329, quoting *In re Ashley B.* (2011) 202 Cal.App.4th 968, 982-983.)

Mother points to the evidence that she and father had not engaged in any domestic violence since the incidents in October 2023, that father had apparently moved out of state, and that she had an active protective order against him. She also notes that she had largely completed her case plan and that there was never any evidence of any injury to T. As the juvenile court noted, mother's progress and improvement is laudable and resulted in her ability to keep T. in her care. Nevertheless, the record contains substantial evidence supporting the court's finding of jurisdiction. Mother had a long

11

history of domestic violence altercations with her partners, often in the presence of her children and most recently while pregnant with T. Although mother continued to insist she was never the aggressor, the record reflects otherwise. Moreover, although she had completed multiple programs, mother continued to lack insight into the issues that brought the family before the court. She denied violating the protective order in October 2023, although she was arrested on that basis, and testified that she should not have been ordered to complete anger management classes. She also repeatedly failed to cooperate with DCFS's attempts to engage with her and assess T. The court properly considered the totality of mother's conduct, rather than solely the allegations that established jurisdiction over T.'s siblings, in determining that a risk of harm to T. remained at the time of the jurisdiction hearing. The court was also entitled to, and did, consider T.'s very young age in determining the potential risk of harm. On this record, we find no error in the court's finding of jurisdiction.

We reject mother's secondary argument that at the time of the disposition hearing, the court should have dismissed the case with a contract allowing mother to voluntarily comply with continued services under section 360, subdivision (b). Under section 360, subdivision (b), the court may, without adjudicating the child a dependent, order that services be provided to keep the family together under the informal supervision of the child welfare agency. (§§ 360, subd. (b), 301; Cal. Rules of Court, rule 5.695(a)(2).) Whether to exercise this option "is a discretionary call for the juvenile court to make." (*In re N.M., supra*, 197 Cal.App.4th at p. 171.) "'The court has broad discretion to determine what would best serve and protect the child's interest and to fashion a dispositional order in accord with this discretion.'" (*Ibid.*, citing *In re Christopher H.* (1996) 50 Cal.App.4th 1001, 1006.) On appeal, we will not reverse the court's dispositional order absent a clear abuse of discretion. (*In re N.M., supra*, 197 Cal.App.4th at p. 171.)

Mother requested dismissal of the case at the disposition hearing, but did not request voluntary family maintenance services. Moreover, as we have discussed, the court had continuing concerns regarding mother's insight and cooperation with DCFS. Under these circumstances, we find no abuse of

discretion in the court's finding that there was a need for continued jurisdiction over T.

## DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


COLLINS, J.

We concur:


ZUKIN, P. J.                                          MORI, J.